IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

Beth Ann Meekison,                          :

          Plaintiff              :        Civil Action 2:09-cv-00113

   v.                                      :

Ohio Department of Rehabilitation &          :        Magistrate Judge Abel
Corrections,

                              :

          Defendants             :

                              :

# ORDER

This matter is before the Court on defendants Reginald Wilkinson, Terry Collins, and Timothy Brunsman's November 15, 2012 motion for summary judgment (doc. 70).

## I.      Background

Plaintiff Beth Ann Meekison was formerly employed as a Psychology Assistant II ("PA2") at the Chillicothe Correctional Institute ("CCI"), a facility operated by the Ohio Department of Rehabilitation and Corrections ("ODRC"). Defendant Reginald Wilkinson and Defendant Terry Collins are former Directors of the ODRC. Defendant Timothy Brunsman is the former Warden of CCI.

Following an earlier disability discrimination lawsuit against the ODRC, plaintiff was reinstated pursuant to an agreement. Director Wilkinson signed that agreement. Plaintiff alleges that the CCI and Warden Brunsman knew that plaintiff was being placed at the institution as a PA2 as a result of a settlement of her Americans with Disabilities litigation. Plaintiff further alleges that Warden Brunsman was aware of

Meekison's disability, dyslexia, and refused to provide her with the necessary accommodations.

Following her reinstatement, Meekison alleges that defendants subjected her to a series of hostile and retaliatory acts including false allegations of misconduct, the denial of necessary training, the arbitrary revision of her job description, and the improper and arbitrary termination of her employment.

Plaintiffs brings this action asserting violations of the Americans with Disabilities Act ("ADA") and the First and Fourteenth Amendments to the United States Constitution.

## II. Arguments of the Parties

### A. Defendants Wilkinson, Collins and Brunsman

Defendants maintain that they are immune from suit for money damages under Title I and Title V for the reasons set forth in their first motion for summary judgment. Defendants argues that they are entitled to summary judgment on Meekison's Americans with Disabilities claims because plaintiff cannot establish a *prima facie* case of retaliation under Title V of the ADA.

Defendants maintain that plaintiff cannot demonstrate that Warden Brunsman had knowledge of her protected activity. According to defendants, plaintiff engaged in protected activity by filing suit in 1996, but she cannot show that Warden Brunsman had knowledge of this. Defendants contend that Meekison has failed to point to sufficient admissible evidence in the record showing that there was at least a genuine

2

issue of material fact as to whether the decisionmaker at CCI, the Warden or any other management staff had knowledge of her protected activity, that is the filing of a federal complaint in 1996. Meekison has not pointed to any admissible evidence in the record showing that the Warden, before making the decision to terminate her employment, had knowledge of the settlement agreement.

Defendants also argue that Meekison cannot establish the fourth element of her *prima facie* case because there is no causal connection between her protected activity and her termination. A gap in time between the protected activity and the adverse employment action weakens an inference of retaliatory motive. Defendants maintain that over 10 years have passed between the filing of Meekison's original lawsuit and her termination.

Defendants maintain that Meekison ignores the intervening causes and alternative explanations for the actions of CCI. According to defendants, there is no evidence showing that Warden Brunsman, Dr. Briggs, Posey-Jones, Steinhoff, Duty and Dennis were aware of the 1996 lawsuit. Defendants argue that plaintiff's claims that she was treated differently than other PA2s at other institutions is also without merit because she is not similarly situated to them.

Defendants further argue that Brunsman terminated Meekison's employment based on legitimate, non-discriminatory reasons. Defendants maintain that Meekison violated several department policies in connection with her unauthorized relationship with inmate Todd Snyder and her failure to cooperate during the subsequent

investigation. The investigation revealed that (1) Inmate Snyder and Meekison discussed her rapport with her co-workers and Snyder's belief that she was isolated; (2) they talked about an EEOC investigation filed against Meekison by Sgt. Dennis and that Snyder thought it was a witch hunt; (3) Meekison visited Snyder in isolation without approval from her supervisor and without a legitimate reason; (4) Meekison failed to report Snyder when he told her that he had romantic feelings toward her, when he referred to Sgt. Dennis as a "horn dog" in Meekison's presence, and when he asked Meekison to go on a date with him after his release from prison; (6) Meekison took criticism from Snyder on how to teach her sex offender classes; (7) Meekison learned how to apply ODRC policies from Snyder; and (8) Meekison disclosed to Snyder that she had received a one-day fine; she attended Culbert Military Academy; she was from Toledo; she was Catholic; she was single; she was not a lesbian but had lesbian friends; she was dyslexic; and she had been in a car accident. Defendants maintain that Meekison corroborated some the aspects of the unauthorized relationship she had with Snyder at her deposition.

Defendants maintain that Meekison cannot show that ODRC's proffered reasons for terminating her employment were pretextual. Meekison fails to show that Brunsman's reasons for terminating her had no basis in fact. The official investigation revealed clearly that Meekison engaged in an unauthorized relationship with Snyder and that she failed to cooperate during the subsequent investigation. Defendants also maintain that Meekison fails to point to any evidence that suggests Brunsman's decision

was motivated by anything other than his stated reasons. Defendants also contend that Meekison cannot show that having an unauthorized relationship with an inmate and failing to cooperate in the subsequent investigation were insufficient to motivate Brunsman's decision to terminate her given that an unauthorized relationship can be very dangerous in a prison. Defendants further argue that Meekison cannot overcome Brunsman's good faith belief because he reasonably relied on the particularized facts at hand when he determined that Meekison had an unauthorized relationship with an inmate and that she failed to cooperate with the official investigation.

Defendants argue that Meekison also cannot establish a *prima facie* case of discrimination under Title I of the ADA. Brunsman first learned of Meekison's request for an accommodation in February 2007. When an employee notified Brunsman regarding the need for an accommodation, he referred the employee to the ADA coordinator. After engaging the informal process required by the ADA, Meekison was found to have received substantial training, she was encouraged to seek out further training, and she was given a quiet place to work. As a result, plaintiff's claim for failure to accommodate must fail because, according to defendants, ODRC provided Meekison with the accommodations that she requested.

Defendants argue that Meekison's Section 1983 claims are barred by the doctrine of qualified immunity because she cannot point to any case law clearly establishing any constitutional violation in connection with her First Amendment Petition Clause and Fourteenth Amendment claims.  Defendants also argue that Meekison fails to state a

claim pursuant to Section 1983 because she fails to allege any direct, personal involvement by Wilkinson, Collins or Brunsman. A defendant can only be liable under Section 1983 for acts he committed. The alleged hostile and retaliatory acts directed toward plaintiff were not committed by defendants. Meekison has not presented any evidence shown that Brunsman actively participated in, encouraged or directed any of the retaliatory acts allegedly perpetrated against her by CCI staff. Additionally, neither Wilkinson nor Collins participated in the decision to terminate Meekison.

Defendants also argue that Meekison's Section 1983 claims against Wilkinson, Collins and Brunsman in their official capacities are barred by the Eleventh Amendment. They contend that her First Amendment claim is baseless because she cannot show that she spoke as a citizen on a matter of public concern. Plaintiff's speech did not relate to any matter of political, social or other concern to the community. A dispute over the conditions of one's employment rarely implicates First Amendment rights. Defendants further argue that plaintiff cannot prove that her discharge was motivated by any protected speech. Plaintiff's complaint asserts a claim based on the violation of her Fourteenth Amendment rights, but defendants maintain that she has failed to articulate which element of the constitutional protection defendants have allegedly violated. Defendants assume plaintiff intended to assert a claim for violation of the Equal Protection Clause, but general retaliation claims do no implicate the Equal Protection Clause.

### B.    Plaintiff Meekison

Plaintiff argues that genuine issues of material fact exist as to whether Warden Brunsman and/or members of his administration knew that Meekison had been re-instated as the result of her protected activity. Meekison maintains that there is sub-stantial evidence that Brunsman and members of the administrative staff at CCI knew that she had been reinstated to her position as the result of a disability discrimination claim that she had filed in court. According to plaintiff, both Brunsman and Judy Imell, the Director of Mental Health at CCI understood that Meekison's placement was the result of a lawsuit against the state. Plaintiff maintains that in January 2006, the Warden complained about being forced to accept Meekison as a PA2 in the Sex Offender Pro-gram because she was not qualified to hold the position and she had not successfully completed her probation at the North Central Correctional Institution ("NCCI"). Plain-tiff maintains that Dr. Sylvester Briggs, Judy Imell, and Stephanie Castle also knew of the circumstances involved in her reinstatement to CCI. Her initial supervisor, Melinda Posey-Jones, resented Meekison's placement in the Sex Offender Program unit.

Plaintiff also asserts that a copy of the Agreement and Memorandum from Human Resources detailing her removal from NCCI, her civil rights litigation, and her reinstatement was sent to CCI and placed in her personnel file. Additionally, plaintiff maintains that she had several discussions with the Warden and her supervisor about her earlier lawsuit and her prior removal from NCCI.  Plaintiff maintains that Dr. Briggs referred to her a "court witch" and a "court bitch." Meekison also contends that Dr.

Robyn Hoffman, her psychology supervisor, also knew that she had been reinstated as a result of a settlement agreement.

Meekison argues that there are material issues of fact as to whether she was harassed, punished and terminated as a result of the exercise of her rights under the ADA. On her first day at CCI, Dr. Briggs greeted her by saying "Ms. Bitchsome." Briggs refused to recognize Meekison as a member of the staff and excluded her from the professional and informal work of the department. He refused to provide the supervision required for PA2s. Meekison was forced to work under the remote supervision of Dr. Robyn Hoffman, the Director of Psychological Services at ODRC, who was located in Columbus.

Brunsman approved a revised position description for plaintiff that almost entirely eliminated her psychology-related responsibilities from her job duties. Meekison was not permitted to conduct mental health interviews and assessments, psychological interventions and treatment, individual and group clinical interventions, treatment assessments, transfer and discharge summaries or to meet and work as part of a combined treatment team. Meekison was reduced to a teaching position despite her classification as a PA2.

Meekison's initial supervisor in the SOP, Melinda Posey-Jones, refused to supervise plaintiff because she had been forced on them by the central office. Posey-Jones refused plaintiff's request for training or orientation despite her lack of teaching experience. Posey-Jones instructed Meekison to consult with the inmate tutors about the cur-

8

riculum and the program materials. Posey-Jones insisted that plaintiff communicate through the inmate tutors assigned to the SOP. Plaintiff maintains that she was subject to arbitrary and unreasonable demands.

In July 2006, William Steinhoff became plaintiff's supervisor. Although he initially praised her work, his attitude changed when plaintiff complained about the changes made to her position description. Two weeks after praising her work, Steinhoff prepared a Performance Improvement plan criticizing her use of inmate tutors to teach her class and other alleged deficiencies. Steinhoff began using the disciplinary process against Meekison. Complaints about plaintiff were referred to investigation without permitting her an opportunity to explain her actions. Steinhoff also supported Sgt. Dennis's allegations that Meekison was sexually harassing him.

Plaintiff argues that there are material issues of fact as to whether she was terminated in retaliation for the exercise of her rights protected under the ADA. On April 3, Steinhoff met with the staff of the SOP to discuss the imminent transfer of the program to the Residential Treatment Unit. Staff were told not to discuss the details with inmates. Later that day, Snyder spoke with Steinhoff and Deana Strohm about his concerns that he would be removed from the program. Based on this conversation, Steinhoff prepared an incident report accusing Meekison of disobeying his instructions about sharing the information with inmates. Arvil Duty was assigned to investigate the matter.

9

Based on Duty's report, Snyder was transferred to isolation. During his interview with Duty, Snyder informed him of the staff's hostile attitude towards Meekison, her isolation from other staff, and Posey-Jones' directive that he serve as an intermediary between her and plaintiff in order to provide program materials and information. He denied any personal or intimate relationship with Meekison or that he was interested in having a personal relationship with her.

On May 3, 2007, Snyder sent a kite to Duty indicating that he wanted to speak with him again because he had not been entirely truthful in the prior interview. Snyder was concerned that he would have wasted 37 months in the comprehensive program and that his failure to complete the program would have consequences with the parole board. Snyder was also concerned that if was removed from the program he would be sent to the Southern Ohio Correctional Facility. Around this same time, Steinhoff also visited Snyder. Duty interviewed Snyder again in the presence Steinhoff. In this inter-view, Snyder acknowledged that he had personal feelings for Meekison, that he had wanted to establish a personal relationship with her, and that she was aware of his feelings. Snyder claimed that Meekison had willingly shared details of her personal life, her attitude toward staff, her feelings of isolation, changes made to her position, and her reaction to Dennis's claim that she was harassing him.

Duty met with Meekison twice. She denied having personal conversations with Snyder about herself, her attitudes toward other staff, and the fine she received as a result of Dennis's allegations. Meekison reported that she included some personal

information in introducing herself to her class and as teaching tools in discussing concepts such as empathy and cultural or religious beliefs. Meekison denied that Snyder ever asked her for a date.

Plaintiff argues that there are genuine issues of fact as to whether her removal for an alleged unauthorized relationship was pretextual. According to Meekison, the evidence suggests that her termination was orchestrated by members of the CCI administration and based upon fabricated evidence. The Warden and the administrative staff were disdainful of plaintiff and resented her presence at CCI. Plaintiff points to the fact that Snyder was interviewed on two occasions by Duty. Snyder initially denied any attempts to establish a relationship with Meekison and was unable to provide any evidence that would justify serious discipline against her. Snyder remained in isolation over a month before he sent a kite to Duty stating that he had not been truthful. According to Meekison, Snyder changed his story only after an unexplained meeting with Steinhoff took place, in which Steinhoff assured Snyder that he would be permitted to finish the program despite his earlier admission to the Rules Infractions Board that he had attempted to establish a relationship with plaintiff.

Meekison further argues that Brunsman cannot rely upon the honest belief defense. Brunsman uncritically accepted Duty's investigation and never sought to determine whether the personal information shared by Meekison was typically shared by other staff members or whether Meekison reasonably relied upon Posey-Jones' instructions to use the inmate tutors for assistance and information. The Warden also

never questioned why Duty failed to determine whether or not plaintiff had violated Steinhoff's instructions when she met with Snyder on April 4. Additionally, plaintiff argues that even if the Warden made an unbiased and objective decision in terminating plaintiff, his decision may be subject to the cat's paw doctrine, in which a biased subordinate without decision-making authority used the formal decisionmaker in an effort to bring about a discriminatory employment action. Steinhoff played a significant role in bringing about the termination of plaintiff. Plaintiff maintains that when the initial investigation failed to produce sufficient evidence to justify the discharge, Steinhoff intervened and went directly to Snyder and assured him that he could successfully complete the comprehensive program. Steinhoff also informed Duty that Meekison had no need to visit Snyder in isolation, which was incorrect. As a result, plaintiff argues that she has raised sufficient questions about the fairness of the investigatory process and the motivation of the parties to survive summary judgment.

Plaintiff argues that defendants' assertion that the time between her litigation and the retaliatory actions is too long for there to be a connection is without merit. Although plaintiff filed her lawsuit in 1996, the settlement agreement which provided for plaintiff's reinstatement at CCI was finalized in November 2005. Meekison went to work at CCI December 5, 2005 and was immediately subjected to retaliation. As a result, there was no significant delay between the event and the retaliatory action.

Plaintiff argues that defendants are not entitled to qualified immunity for a public official to execute an agreement and then flaunt one of its key components without

12

consequences. With respect to her claim based on the First Amendment, plaintiff argues that the Constitution protects citizens from retaliation by public officials for complaining about violations of their civil rights.

Plaintiff maintains that the CCI and Steinhoff refused to make any accommodation for the plaintiff's dyslexia including allowing her a quiet location to do her work and training to learn the DOTS reentry system. Plaintiff was granted an accommodation over a year after she made her initial request. CCI was made aware of the need for an accommodation in January 2006 and failed to respond for over a year.

### III. Summary Judgment

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party asserting the absence or presence of a genuine dispute must support that assertion by either "(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials"; or "(B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

A party may object that the cited material "cannot be presented in a form that would be admissible in evidence," and "[t]he burden is on the proponent to show that

the material is admissible as presented or to explain the admissible form that is antici-

pated." Fed. R. Civ. P. 56(c)(2); Fed. R. Civ. P. 56 advisory committee's note. If a party

uses an affidavit or declaration to support or oppose a motion, such affidavit or decla-

ration "must be made on personal knowledge, set out facts that would be admissible in

evidence, and show that the affiant or declarant is competent to testify on the matters

stated." Fed. R. Civ. P. 56(c)(4).

 While the court must consider the cited materials, it may also consider other

materials in the record. Fed. R. Civ. P. 56(c)(3). However, "[i]n considering a motion for

summary judgment, the district court must construe the evidence and draw all reason-

able inferences in favor of the nonmoving party." *Revis v. Meldrum*, 489 F.3d 273, 279

(6th Cir. 2007) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587

(1986)). "The central issue is 'whether the evidence presents a sufficient disagreement to

require submission to a jury or whether it is so one-sided that one party must prevail as

a matter of law.'" *Id.*, 489 F.3d at 279–80 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 251–52 (1986)).

## IV.  Discussion

 Plaintiff asserts claims against defendants Wilkinson, Collins and Brunsman in

both their official and personal capacities. "[D]amages actions against public officials

require[] careful adherence to the distinction between personal- and official-capacity

suits." *Kentucky v. Graham*, 473 U.S. 159, 165 (1985). "[A] suit against a state official in his

or her official capacity is not a suit against the official but rather is a suit against the

14

official's office," and, "[a]s such, it is no different from a suit against the State itself." *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989).

Title I of the Americans with Disabilities Act did not abrogate the states' Eleventh Amendment immunity, and, as a result, individuals may not sue states for money damages under Title I. *Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 374 (2001). Individuals can seek prospective injunctive relief for Title I violations pursuant to *Ex parte Young*. *Id*. at 374 n. 9; *see Ex parte Young*, 209 U.S. 123 (1908). Under *Ex parte Young*, an action may be commenced only against a state official acting in his official capacity and may "seek [only] prospective relief to end a continuing violation of federal law." *Whitfield v. Tennessee*, 639 F.3d 253, 257 (6th Cir. 2011)(quoting *Carten v. Kent State Univ.*, 282 F.3d 391, 395 (6th Cir.2002).

Plaintiff has not submitted any evidence demonstrating that defendants Wilkinson or Collins participated in any of the alleged retaliatory acts or in the decision to terminate her employment. As a result, defendants' motion for summary judgment is GRANTED with respect to plaintiff's claims against defendants Wilkinson and Collins. Although plaintiff's claims against defendant Brunsman in his official capacity may go forward, her claims against him in his personal capacity may not:

> Individual supervisors who do not independently qualify under the statutory definition of employers may not be held personally liable in ADA cases. Thus, as the district court held, the claims against [the defendant] in his individual capacity should be dismissed. *See Wathen v. General Electric*, 115 F.3d 400, 404–05 n. 6 (6th Cir.1997) (holding that an individual supervisor may not be held personally liable under Title VII and noting that the Title VII and ADA liability schemes are similar in this regard).

15

*Sullivan v. River Valley School Dist.*,  197 F.3d 804, 808 at n.1 (6th Cir. 1999). As a result, defendants' motion for summary judgment on plaintiff's ADA claims against Brunsman in his personal capacity is GRANTED.

### A.    Retaliation in Violation of the ADA

Plaintiff asserts that she was retaliated against for pursuing her rights under the Americans with Disabilities Act. To establish a *prima facie* claim of retaliation, a plaintiff must demonstrate that:

> (1) She engaged in activity protected by [the ADA]; (2) the defendant knew of her exercise of her protected rights; (3) the defendant subsequently took an adverse employment action against the plaintiff or subjected the plaintiff to severe or pervasive retaliatory harassment; and (4) there was a causal connection between the plaintiff's protected activity and the adverse employment action.

*Johnson v. Cleveland City Sch. Dist.*, 344 F. App'x. 104, 113 (2009) (quoting *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 516 (6th Cir. 2009)). Defendants maintain that Meekison cannot establish the second or fourth elements of her *prima facie* case.

Second element: Knowledge of protected activity. Defendants argue that plaintiff cannot show that Warden Brunsman had know-ledge of Meekison's protected activity. Plaintiff maintains, however, that there is substantial evidence that Brunsman and members of the administrative staff at CCI knew that she had been reinstated to her position as the result of a settlement of her disability discrimination lawsuit. In her December 21, 2010 declaration ("Meekison Decl. I"), Meekison states her personnel file at CCI contained a November 16, 2005 letter from Christina Wendell that summarized

16

her history with ODRC.[1] Meekison Decl. I, ¶ 10 Doc. 74-1, PageID 2610. When deposed, Meekison said she had seen documents in her personnel file that showed the history of her being returned to work following the federal court litigation. Meekison Dep., 205: 9-16, Doc. 26-8, PageID 263. Meekison asserted that anyone could have had access to a personnel file during business hours, but that she did not know the name of anyone who had, in fact, accessed her personnel file. Meekison Dep., 401:9-403:3, Doc. 27-7, PageID 592-94.In her December 28, 2012 declaration ("Meekison Decl. II"), Meekison stated that Warden Brunsman was aware that she was reinstated at CCI based on the settlement agreement and that in a January 2006 meeting with her and Judy Immell, the Mental Health Administrator at CCI, he complained that she had been forced on him by ODRC despite her not being qualified or competent to work as a PA2 in SOP based on her previous failure to complete probation. Doc. 74-1, PageID 2645 at ¶ 3. According to plaintiff's declaration, at a subsequent meeting with the Warden and her union representative, Meekison asked Brunsman why the settlement agreement and memorandum were in her file. Meekison specifically referred him to the provision of the settlement agreement requiring that her prior history be expunged from her record. *Id.* at ¶ 4.

---

[1]Wendell's November 16, 2005 Memorandum stated that Meekison had been removed from her probationary PA2 position in October 1994, filed a lawsuit alleging she was discharged because of her age and disability, and that after an appeal and subsequent denial of summary judgment, Meekison and ODRC settled the lawsuit by ODRC paying her $15,000 and reinstating her to a PA2 position. Doc. 38-6, PageID 2152 and Doc. 74-1, PageID 2626.

17

Plaintiff also stated that other supervisory staff were aware of her prior history and litigation, including Judy Imell, the CCI Director of Mental Health, Melinda Posey-Jones, plaintiff's first supervisor at CCI, and Dr. Sylvester Briggs, CCI's Director of Psychology Services. Plaintiff alleges that Dr. Briggs was hostile to her when she arrived at CCI and referred to her as "Ms. Bitchsome".  Plaintiff also states that he called her a "court witch" and "court bitch." *Id.* at ¶ 6. Dr. Briggs was ordered to receive corrective counseling. Brunsman Dep., 36: 15-37:23, Doc. 38-1, PageID 2069-70.

Meekison, a PA2, had as her supervisors both the director of the CCI sex offender program and a psychologist. Although Meekison was willing to be supervised by Dr. Briggs, CCI's Director of Psychological Services, during a March 2006 meeting with Warden Brunsman, he refused to do so. Dr. Stephannie Castle, the only other psychologist at CCI who could have supervised Meekison, declined to do so.[2] Since no psychologist at CCI was willing to supervise Meekison, Dr. Robyn Hoffman, ODRC's Director of Psychological Services, whose office was in Columbus, became her supervisor.  *Id.*, 39:4-41:12 and 43:11-20. PageID 2072-74 and 2076.

I recognize that plaintiff's evidence that Warden Brunsman knew about Meekison's reinstatement as a result of the settlement of the federal lawsuit rests largely

---

[2]Dr. Castle testified that she met with Meekison in January 2006 to discuss supervision. Castle Dep. 21:19-22:13, Doc. 36, PageID 1828-29. She initially said she would, but changed her mind when Meekison said she was a sexual assault victim and feared she might have a disassociative reaction if sex offenders shared their stories. *Id.* 22:14-23. Castle testified that one of her duties was to her clients, and she felt that there was a risk of harm to the clients if Meekison were to have an episode of disassociation while working with sex offenders. *Id.* 24:2-17.

on her testimony, but that testimony is buttressed by her evidence of Dr. Briggs' hostility toward her and the unexplained presence of the Wendell letter in her personnel file. This evidence and reasonable inferences drawn from it are sufficient, if credited by a reasonable juror, to prove by a preponderance that the Warden and members of his administration were aware that plaintiff had been reinstated as a result of her protected activity and were hostile to her because of that reinstatement.

Fourth element: Causal connection. Defendants also argue that Meekison cannot establish a causal connection between her protected activity and her termination. Defendants characterize plaintiff's protected conduct as filing suit in 1996. Defendants emphasize that the extended length of time that elapsed between 1996 and the allegations asserted in this action, but this is not a fair characterization of the relevant time line. Following the settlement of her 1996 lawsuit, plaintiff returned to work at ODRC on December 5, 2005. Plaintiff alleges that on the first day of her reinstatement at CCI, Dr. Briggs referred to her as "Ms. Bitchsome." Shortly after she returned to work, Ms. Posey-Jones allegedly complained to plaintiff that she was being forced upon them. In January 2006, the Warden allegedly made similar complaints. These statements were all made close in time to Meekison's restatement. To varying degrees, these alleged statements all refer to plaintiff's initial lawsuit against ODRC or the subsequent settlement agreement. This evidence, if credited by a reasonable juror, would support a finding that there was a causal connection between the plaintiff's protected activity and

19

the adverse employment action. Therefore, plaintiff has met her burden of establishing a *prima facie* case.

Defendants' proffered neutral reason for plaintiff's discharge. Once a plaintiff has met the burden of establishing a prima facie case, the burden shifts to the defendant to come forward with a legitimate, nondiscriminatory reason for its action. If an employer articulates a legitimate reason for its action, the burden of production shifts back to the plaintiff to demonstrate that the employer's reason is pretextual. Defendants argue that even if Meekison established a *prima facie* case of retaliation, ODRC had a legitimate, non-discriminatory reason for termination because plaintiff violated several department policies in connection with her unauthorized relationship with inmate Snyder and failed to cooperate during the subsequent investigation.

Evidence regarding Meekison's alleged unauthorized relationship with inmate Todd Snyder. The investigation was initiated by Warden Brunsman after Steinhoff made an April 4, 2007 Incident Report stating that Snyder had told Deanna Strohm on April 3 that Meekison had told him they were getting rid of him as a tutor. Duty Dep. 21:11-21 and Ex. Doc. 37 and 37-7, PageID 1879 and 1996. The investigation was conducted by Arvil Duty, who interviewed Snyder, Meekison and Steinhoff, then wrote a report to Warden Brunsman who terminated Meekison's employment for having an unauthorized relationship with inmate Snyder, visiting him in isolation, and failing to cooperate in the investigation by not directly answering questions asked. Brunsman

Dep. 82:5-7, 84:14-85:1 and Exs. 9 and 10 , Doc. 38-3 and 38-13, PageID 2115-16 and 2159-67.

ODRC 31-SEM-07 establishes a policy that all employees "maintain a professional relationship" with inmates and requires employees to report any unauthorized relationship. Steinhoff Dep., Exh. 6, Doc. 26-14, PageID 333. An unauthorized relationship is defined as: "A relationship with any individual under the supervision of [ODRC] . . . which has not been approved by the Managing Officer . . . in writing." *Id.*, PageID 334. The policy forbids employees "from engaging in any personal or business relationship(s) with any individually currently under the supervision of the department . . . ." *Id.* Employees have the obligation to report not only relationships, but also potential unauthorized relationships. *Id.*, PageID 336-37. Further, "[e]mployees who fail to report knowledge of a potential unauthorized relationship or withhold information concerning a potential unauthorized relationship may be subject to disciplinary action, up to and including removal." *Id.*, PageID 337.

During pre-service training, employees are told not to give out personal information to inmates. Steinhoff Dep., 305:19-306:5, Doc. 31-6, PageID 1272-73. Meekison received some training in unauthorized relationships both during pre-service training and in-service training. Meekison Dep., 96:20-97:3, 102:7-10 and Exh. 14, Doc. 26-3 and 26-22, PageID 154-55, 160 and 347.

Steinhoff was concerned about Snyder being in Meekison's office too much. Steinhoff Dep., 300:4-8, Doc. 31-6, PageID 1267. On January 24, 2007, Meekison emailed

Dr. Hoffman, her psychologist supervisor, that Snyder told her that day that "he was getting excluded (the chill) from the Comprehensive program, inmate tutor's rewrite activity under Deana and Bill Steinhoff." Hoffman responded that the inmate's comments were inappropriate. *Id.*, 301:5-13, PageID 1268; Meekison Dep. Ex. 46, Doc. 26-54, PageID 415. Meekison's email also said, "My inmate tutor believes that I may have crossed a line of my co-workers' comfort with having this project discussed; even casually." Dr. Hoffman responded, "It sounds to me like the offender is the one who has crossed the line. Where does he get his information and why is he discussing his speculations with you?" *Id.*, PageID 416. Meekison's email further stated, "This tutor values his work as a tutor and wishes to remain one; even if CCI succeeds in getting rid of me or I continue working here." Dr. Hoffman responded, "My recommendation to Mr. Steinhoff will be that this offender be removed from the program. How does any of this have anything to do with CCI getting rid of you!!!???" *Id.*

Either on January 24 or shortly after, Steinhoff talked with Dr. Hoffman about his concerns that something inappropriate could be going on between Meekison and Snyder. Steinhoff Dep., 300:20-24, Doc. 31-6, PageID 1267. Steinhoff told Dr. Hoffman that she should talk to Meekison about her relationship with Snyder and why she made the comment about his believing Strohm and himself were chilly toward him. *Id.*, 301:17-302:3, PageID 1268-69.

During his investigation, Arvil Duty interviewed three people: Snyder, Meekison, and Steinhoff. Duty interviewed Snyder on two occasions. During each of

these interviews, as well as those of Meekison, Duty wrote out questions to which the interviewee wrote out answers. He asked Snyder to explain the things he spoke with Meekison about. Snyder wrote in response that he talked with her "about her rapport with her peers[,] . . . the upcoming move of the SOP-sex offender program[, and] . . . the fact that she had been under investigations (past and currently)." Snyder's April 13, 2007 Inmate Confidential Statement, Doc. 37-8, PageID 1997. Snyder also told Meekison his opinion about an EEOC claim Sgt. Denis filed against her. *Id.* Snyder acknowledged his "belief that some of the conversations that we had crossed lines of DRC policy as I know them . . . by having conversations that are in violation of DRC policy and providing her with information about things that happened or were happening in the program and with staff. I allowed her to use my knowledge of said information. I allowed her to manipulate me." *Id.*, PageID 1998. The first interview of Snyder led to disciplinary charges[3] against him but not against plaintiff.

When Duty interviewed Meekison on April 26, 2007, Duty asked whether she gave and received information to/from inmate Snyder. She said that she did so "per the express directions of Melinda Posey-Jones . . . ." Meekison's May 10, 2007 Investigator's Office Statement, Doc. 37-10, PageID 2004. Meekison's April 26, 2007 Investigator's Office Statement, Doc. 37-12, PageID 2018. She said that Snyder volunteered his

---

[3]Snyder pled guilty to establishing a personal relationship with Meekison and received 15 days in isolation and up to an additional 180 days in isolation with a recommendation that he be transferred to another facility. Duty Dep. Ex. 46, Doc. 37-6, PageID 1990.

perceptions about staff but she shut down that conversation and was considering

referring him to mental health services. *Id.* She said she did "not encourage and/or

solicit information" from inmates. *Id.*, PageID 2020.  Duty's written question asked

whether Meekison "shut Inmate Snyder down (stop him) each time he told [her] staff

do not like you? (yes or no)?" She responded that sometimes she may not have

understood what he was saying because he used "inmate speak." She recalled "his

being highly upset on April 3, 2007 and making such representations so that I got what

he was saying. I did not even have time to do anything–as I was called to a meeting.

When I came back to attend the blatant communication, he was off the unit." *Id.*, PageID

2021. Duty persisted in insisting that the question be answered "yes" or "no." Meekison

responded:

> On April 3, 2007, inmate Snyder was extremely upset about losing
> his home, his 3 year. plus room on the A-1 Unit. He was very upset about
> losing his job as a tutor.  I was considering a Mental Health referral as this
> inmate was out of character in many ways. The least of my concern was
> what he was directing at me as a staff.
>     . . . Sex offenders attempt to manipulate and seek power and
> control; especially when they are in crisis–as potentially seemed to be the
> concern I attempted to follow up on April 3, 2007 after my second
> investigation of the day which was interrupted . . . .

*Id.*, PageID 2022-23. Shortly before the conversation ended, Snyder told Meekison that

he thought staff were trying to isolate her. *Id.*, PageID 2025. Meekison also acknow-

ledged that Snyder had made speculative comments to her about Sgt. Dennis and his

dispute with her. *Id.,* PageID 2026-28. Snyder referred to Sgt. Dennis as "horn dog." *Id.*,

PageID 2029.

Duty asked Meekison in writing whether she told Snyder about his moving out of the unit. Meekison responded that Snyder and other inmates told her they were moving out the unit before Steinhoff told staff about the move. *Id.*, PageID 2029.

On May 7, 2007, after Steinhoff came to see him in isolation, Snyder gave a second statement to Duty. He said that Meekison visited him in isolation on April 11. She asked how he was doing. He told her he thought he knew why he was in isolation and that he would be leaving the sex offender program when he got out. Then, "I told her . . . how I felt in my heart about her. I then told her to save herself and her job." Snyder's May 7, 2007 Inmate Confidential Statement, Doc. 37-9, PageID 2000. Snyder said Meekison gave him information about previous investigations of her for misconduct. He saw a report "that docked her one day's pay for the 'town hall' meeting on 12/20/2006 that she attended with Sgt. Dennis." *Id.*, PageID 2001. In November 2006, Meekison said Steinhoff changed his opinion of her and acted differently toward her after November 9, 2006. *Id.*, PageID 2002. Snyder said he had referred to Sgt. Davis as a "horn dog" in conversation with Meekison. *Id.* Further, Snyder said Meekison gave him the following information about her personal life: she went to Culver Academy; came from Toledo; was a Catholic; was single; wasn't a lesbian, but had lesbian friends; worked at the old OP, NCCI, and the AG's office as an investigator; was dyslexic; was hurt in a car wreck; that Steinhoff told her she could no longer work at home; and that she was the most investigated person at CCI. *Id.*, PageID 2001.

Duty asked Snyder if he asked Meekison if he could see her after he was re-
leased. Snyder wrote: "I asked Mrs. Meekison if it would ever be possible for us to go
on a date, after I was released. I told her that I was interested in dating her. She said that
she was only interested in me professionally." *Id.* Duty asked if he told Meekison he
"wanted to continue the relationship after she moved to the RTU building," and Snyder
responded, "I asked if it was possible for us to continue this after she moved to the
mental health building. She said yes. She was always interested in being supportive of
me." *Id.*, PageID 2002.

When Duty interviewed Meekison a second time on May 10, 2007, she admitted
using some information about her personal life during her sex offender class
presentations. Meekison's May 10, 2007 Investigator's Office Statement, Doc. 37-10,
PageID 2004. She said that in early April 2007 she had heard rumors that Snyder had
placed himself in protective custody and might be going to another camp and asked
Steinhoff and Deana Strohm about him and they said they did not know what had
happened, to check in segregation. She then went to see Snyder in isolation. *Id.*, PageID
2005-06 and 2009. Duty asked Meekison that when she visited Snyder in isolation, did
he say he was leaving the program "because it would be too difficult for him to be
around you because [of] how he felt about you in his heart?" Meekison responded,
"Yes, and having heard this clarification, I could not have him around me under any
circumstances in the future. So this was good." *Id.*, PageID 2010. Asked whether she
reported this conversation, Meekison said that she did not because she understood

26

Snyder was moving to another camp. She reasoned that his transfer to another facility mooted his having developed an attachment to her. She asserted that "he was *not attempting to establish a relationship* in segregation. *He was appropriately seeking distance and not additional contact.*" *Id.* (Emphasis in original.) Nonetheless, Meekison testified during her deposition that she told Snyder to write a kite to Deana Strohm, his social worker, about his inappropriate feelings toward her; and she told Strohm to expect a kite from Snyder about his feelings toward her. Meekison Dep., 480:18-482:2, Doc. 28-1, PageID 864-66.

Duty asked Meekison if Snyder had asked her to go out on a date after he was released. She responded:

> After I got a phone call for a second investigation of the day, Inmate Snyder was asking rapid questions-acting as if I was not going to be around. He said something about a "date." I was not absolutely sure of the context. I did not have time for asking him to clarify questions as I was wanted at an administrative meeting. Regardless [of] lack of clarification and instinctively, I said, "no." When I came back from the meeting, I intended to follow up on clarification of this question, his unusual for him general behavior and more. He was not on the Unit and had gone to segregation.

Doc. 37-10, PageID 2007-08. Duty asked Meekison whether she saw Snyder "as a supervisor, friend, or co-worker?" She responded:

> Administration placed Mr. Snyder in the position of giving me program directions. As I did not have training to be on a sex offender unit with inmates, some [of] whom are highly manipulative, Mr. Snyder gave me education to be a safer staff. Mr. Snyder stepped in to guide; when Melinda Posey-Jones stepped out per CCI Administration, he did as directed. Per CCI Administration, I listened to his communications and

27

> followed the format Posey-Jones set up for me as a worker. Mr. Snyder
> was and is not my friend. . . .
>
> Did Mr. Snyder do the work Administration asked him to do for
> the program. Yes, for Mr. Steinhoff, Mr. Snyder reports he did ~75 hrs.
> (about) of rewriting the state's program with other tutors. Was he my co-
> worker, No. Inmates, no matter how good they are at a job, have a past,
> negative history. Sex offenders are sex offenders actively and/or in
> remission. There is no cure. I did and do not see him as being a co-worker.
> If the state thinks this, then I am quitting–as that is unsafe. May I add that
> Snyder was working on other program projects December 2006, January
> 2007, February 2007, March 2007 and I had little contact with him
> compared to others.

*Id.*, PageID 1012-14.

When asked whether discharge for an unauthorized relationship was typically

for an intimate relationship, Warden Brunsman responded that it could also involve

bringing in drugs, giving an inmate the staff member's home telephone number so the

inmate can telephone the employee at home, giving the employee's home address so the

inmate may write the employee at home, and exchanging favors. Brunsman Dep. 86:14 -

87: 12, Doc. 38-3, PageID 2119-20. Brunsman believed Meekison had an unauthorized

relationship with Meekison because she provided him with personal information about

herself and failed to report his asking to date her after he was released from prison *Id.*,

88:23-89: 15, PageID 2121-22. Brunsman testified that "withholding information where

an inmate tries to date you or withholding information where an inmate says he likes

you romantically or giving information to an inmate that says staff is out to get you,

stuff like that, in my opinion, is very  inappropriate." *Id.*, 104:10-16, Doc. 38-4, PageID

2137.

<u>Pretext</u>. Plaintiff argues that this proffered neutral reason for terminating her employment is pretextual. There are three primary methods by which plaintiffs generally show pretext: by showing that the proffered reason, (1) had no basis in fact; (2) was insufficient motivation for the employment action; or (3) did not actually motivate the ad-verse employment action. *Smith v. Chrysler Corp.*, 155 F.3d 799, 805-06 (6th Cir. 1998).

<u>Plaintiff's proffered evidence of pretext</u>. Plaintiff argues that there is substantial evidence to support a finding that her termination was orchestrated by members of the CCI administration on the basis of fabricated evidence. Plaintiff points to the fact that defendants rely upon the statement of inmate Snyder to justify her termination. Snyder provided the needed rationale to defendants only after spending a month in isolation with fears he would be barred from completing the comprehensive sex offender program.[4]

Plaintiff argues that although after Steinhoff became Meekison's supervisor in July 2006 he initially praised her work, his attitude changed when plaintiff complained about the changes made to her position description. In an September 28, 2006 memo to

---

[4]Snyder testified he had completed the program but still needed a final evaluation that would go into his file and be available to the parole board. July 9, 2010 Deposition of Todd Snyder, p. 66, Doc. 34, Page-ID 1697. Sex offenders were required to take the program to be eligible for parole. When Steinhoff came to see Snyder in isolation, he gave him his discharge summary, so he completed the program and was at the time of his deposition in a reentry program. (*Id.*)

Dr. Hoffman, Steinhoff–supporting Meekison's desire to do more than just run the

mandatory sex offender program class–wrote:

> I was thinking it would be good to find some other groups or classes that
> Ms. Meekison could help develop and run with inmates. She is bright and
> creative and I feel that channeling that energy into benefitting the inmates
> on A-1 would benefit all.

*Id.*, 75:7-76:8 and Ex. 1, Doc. 30-2 and Doc. 30-6, PageID and 1030-31 and 1093. His

October 23, 2006 evaluation of Meekison stated that as to every category she either met

expectations or performed above expectations. *Id.*, 80:11-18 and 82:4-7 and Ex. 4, Doc.

30-3 and 30-9, PageID 1035, 1037 and 1096-1101. When this evaluation was made,

Steinhoff had been supervising Meekison for a little over three months. *Id.*, 82, PageID

1037.

> On October 26, 2006, in response to the evaluation, Meekison wrote:

> Please note that I do not recognize the position description of March 30,
> 2006 signed by Warden Brunsman, as the job offer and acceptance from
> Federal Court in November 2005. There is a big difference and critical
> difference that blatantly violates federal court settlement.

*Id.*, Ex. 4, PageID 1101.[5] Steinhoff testified that when he met with her to discuss the

evaluation, she complained that her job description differed from that of the usual PA2

because it was all teaching without any counseling. *Id.* 96:10-97:6, PageID 1051-52.

Steinhoff said that Meekison was teaching sex offender program inmates about errors in

---

[5]The job description for PA2 includes providing psychological intervention,
assessment, and treatment. *Id.* 91:9-93:7 and Exs. 5 and 6, Doc. 30-3 and 30-10, PageID
1046-48 and 1102 and 1103. The new, March 2006 job description for Meekison's PA2
position at CCI eliminates these usual psychology assistant duties limits the job
description to teaching duties in the sex offender program.

their thinking and how to change their thinking. This teaching is based on a

psychological model, but it is not clinical psychology work. *Id.* 98:3-13, PageID 1053.

In response to Meekison questioning her job description, Steinhoff asked

personnel if it was the right job description for her and was told that it was. *Id.* 99:19-

100:3, PageID 1054-55. Steinhoff told sex offender program director David Berenson that

Meekison was unhappy with her job description. Berenson said that PA2s and sex

offender program teachers do different work, so the job description was changed. *Id.*

101:20-102:8,Doc. 30-4, PageID 1056-57. Dr. Hoffman, Meekison's psychology

supervisor, testified that the first time she was aware of the PA2 job description was in

March 2006 when plaintiff's job description was changed. She believed the job

description was changed to conform to the duties of a PA2 in the sex offender program.

Hoffman Dep. 163:2-164:5-19, Doc. 33-6, PageID 1513-14. A position description

describes the duties the employee is expected to be able to perform, but it does not

require that those duties be assigned to the employee. *Id.* 165:12-20, PageID 1515.

On November 9, 2006, Steinhoff prepared a performance improvement plan for

Meekison criticizing her use of inmate tutors to teach her class and other alleged

deficiencies. Steinhoff Dep. 165:14-166:5 and Ex. 13, Doc. 31-1 and 31-11, PageID 1132-33

and 1317. Steinhoff testified that the plan was precipitated by reports from the security

staff that Meekison was not in the classroom when her class was being taught. *Id.* 166:6-

11, PageID 1133. The initial report was from Sgt. Dennis, and that report was confirmed

by a correctional officer. *Id.* 166:16-20, PageID 1133. Dennis said a tutor was in front of

31

the class and Meekison 22-167:8, PageID 1133-34. The November 9, 2006 performance

improvement plan advised Meekison not to leave her classroom while teaching. It also

required her to get the permission of the director of the sex offender program to observe

other classes, warned her not to do personal work on state time, and directed her to

report to her assigned area after clocking in.

Plaintiff argues that Steinhoff began using the disciplinary process against

Meekison after she challenged her job description. Complaints about plaintiff were

referred to investigation without permitting her an opportunity to explain her actions.

Steinhoff also supported Sgt. Dennis's allegations that Meekison was sexually harassing

him.[6]

Dr. Hoffman, Meekison's psychology supervisor, testified that in her opinion

both Steinhoff and sex offender program director David Berenson were dissatisfied

with plaintiff's job performance. Hoffman Dep. 189:4-9, doc. 33-7, PageID 1539. Dr.

Hoffman believed that Berenson did not want Meekison to be in the sex offender

---

[6]Sgt. Dennis and Meekison did not get along. Although Dennis was assigned to the sex offender program unit, he worked in another building when Steinhoff came to CCI in July 2006. Later he was transferred by the unit manager to Steinhoff's floor. *Id.* 114:4-115:9, PageID 1069-70. He filed a sexual harassment complaint against her after she offered to have him stay at her house to recuperate from planned surgery. Meekison was told to stay away from Dennis. During a December 20, 2006 sex offender program meeting with staff and 86 inmates, Meekison walked over and stood next to Dennis. After the meeting, Dennis came to Steinhoff and said he was upset about Meekison standing next to her. Steinhoff thought Meekison displayed questionable judgment. Dennis complained, and Meekison was disciplined, being required to work one day without pay. Steinhoff played no part in the discipline. *Id.* 129:4-130:22 and 134:11-135:7, Doc. 30-5, PageID 1084-85 and 1089.-90

program: " . . . I don't believe Mr. Berenson really likes having anybody in psychology in a sex offender program." *Id.* 189:22-190:15, 1539-40. He "was never crazy about anybody in psychology because psychologists want to do treatment." *Id.* 198:6-13, 1548. Nonetheless, Dr. Hoffman was surprised by the termination of Meekison's employment. She didn't see it coming. *Id.* 195:2-19, PageID 1545.

Plaintiff also argues that Snyder's dramatic change in his story between his first and second interview suggests that Steinhoff negotiated a *quid pro quo* with Snyder to bring about Meekison's termination. Steinhoff testified that he visited Snyder:

> To – so I guess I did see him at least once in isolation to find out if he - - I guess to find out of he needed anything returned or if he had everything from the program, you know, his belongings, that kind of stuff, and just to see how he was doing .
> . . .
> He was in segregation for a long time . . . .

Doc. 31-6 at PageID 1257; Steinhoff Dep. 290:3-11.

Snyder testified that Steinhoff brought him his relapse and discharge summary. The whole meeting took about three minutes. Snyder Deposition., 66:15-67:10, Doc. 34-2 at PageID 1698-99. They did discuss Meekison "a little bit." *Id.*, 67:11-14, PageID 1699. Snyder testified that about a week before Steinhoff's visit his mother wrote him and told him that the most important thing was to complete the sex offender program and that after thinking about it he then decided to tell the whole truth to Duty. Snyder Deposition., 86:5-88:5, Doc. 34-3, PageID 1718-21. Snyder testified, "[W]e should not

33

have been having the conversations we were having. How we got from A to Z doesn't matter." Snyder Dep. 91:5-8, PageID 1721.

Plaintiff also argues that Duty's investigation was questionable. Duty ignored Meekison's representations that she and other staff members provided personal information to inmates as part of their teaching methods. Plaintiff's Exh. C; doc. 74-1 at PageID 2653. Duty did not follow up with inmates in her class to find out whether Snyder could have learned the information about Meekison while she taught her class, and he never asked other staff members if they also incorporated the use of personal information during their instruction. *Id.* Duty also failed to ask Snyder why Meekison visited him while he was in isolation. *Id.* at PageID 2655. In his testimony before the arbitrator, Duty indicated that he never asked Meekison whether she told Snyder about changes to the program even though this allegation was the basis for his investigation. *Id.* at PageID 2651.

<u>Failure to cooperate with the investigation</u>. Defendants also rely on Meekison's failure to cooperate with the investigation as a basis for her termination. In his written questions to Meekison, Duty attempted to obtain yes or no answers to some of his questions. In her responses, Meekison indicated that a yes or no response was not possible given the circumstances. Meekison provided an explanation for her conduct rather than simply confirming or denying that she per-formed certain acts. From a review of the questions posed and her responses, I cannot say that a reasonable trier of

fact would be compelled to find she failed to cooperate with the investigation based on these responses alone. *See* doc. 37-12 at PageID# 2018-33.

**Conclusion.** Once again, much of plaintiff's evidence of pretext is her own testimony. Moreover, the uncontroverted evidence regarding her conduct toward inmate Snyder goes a long way toward supporting Warden Brunsman's finding that she had an unauthorized relationship with Snyder because she provided him with personal information about herself and failed to report his asking to date her after he was released from prison.

Moreover, the facts contained in the written statements by Meekison and Snyder can certainly be read to support the Warden's determination that they had an unauthorized relationship, as defined by ODRC 31-SEM-07, that merited firing. Meekison telescopes all of the communications by Snyder to her that arguably prove an unauthorized relationship into the April 3, 2007 conversation during which he was agitated by his impending loss of his tutor job. She maintains that his knowledge of discipline against her could have been obtained by his looking at disciplinary communications on her desk or through the inmate grapevine. In contrast, Snyder describes an ongoing relationship during which he discussed other staffs' attitude toward her, disciplinary action against her, and other matters with her. If Snyder's statements are credited, Meekison put the safety of staff at risk by discussing her

relationship with other staff members and the details of investigations of her for misconduct with him.

More troubling, Meekison's explanation of why she did not report Snyder's April 3 and April 11, 2007 statements to her chain of command do not ring true. Her testimony that she told Snyder to talk with his social worker, Deanna Strohm, about his romantic interest in her would be mitigating evidence but no substitute for reporting Snyder's attempt to establish an unauthorized relationship with her to her supervisors. Her opinion that no further harm would result because Snyder was in isolation and likely to be transferred to another prison in effect substituted her own "rule" for ODRC's unauthorized relationship policy.

Nonetheless, plaintiff offers evidence suggesting that the proffered reason either had no basis in fact or did not actually motivate the adverse employment action. Plaintiff presented evidence that she was subjected to numerous investigations. The original stated basis for Duty's investigation–that Meekison told Snyder about the imminent move to the Residential Treatment Unit–was apparently never investigated by him.[7] After Steinhoff went to isolation to see Snyder, Snyder provided Duty and

---

[7]Duty testified at Meekison's July 2008 arbitration that his investigation was initiated by Steinhoff's April 3, 2007 incident report that Ms. Strohm told him inmate Snyder came to her because Meekison had come to him to tell him about the tutor program. (Arbitration Transcript, July 22, 2008, pp. 62-63, Doc. 74-1, PageID 2651.) However, he never questioned Strohm and did not ask either Snyder or Meekison about whether Meekison came to Snyder and told him about changes in the tutor program. (*Id.,* pp. 63-64, PageID 2651.) [Contrary to that testimony, Duty's May 15, 2007 Report of

Steinhoff with a statement admitting that he and Meekison had an inappropriate

relationship. However, it does not appear that any explanations or denials by Meekison

were ever considered or investigated. In her testimony, Meekison acknowledged that

Snyder had told her that he had feelings for her. She also testified, however, that she

reported this information to Snyder's social worker and told her that she had instructed

Snyder to send a kite to his social worker regarding the matter. Her explanation for the

personal information Snyder knew about her was that it was information she

communicated to all inmates in her sex offender program classes. While Steinhoff

testified that he did not communicate personal information to inmates when he taught

and that ODRC training emphasized not communicating personal information to

inmates, Meekison asserts that other sex offender program teachers communicated

some personal information to their classes as a teaching method.

     While arguably thin, I conclude that the evidence offered by plaintiff could, if

fully credited, convince a trier of fact by a preponderance that defendants' reasons for

terminating Meekison had no basis in fact or that they were not the real reason for her

termination.

---

Investigation to Warden Brunsman states that Snyder told him that Snyder told him
(Duty) that Meekison told him (Snyder) about the unit moving and that he might
possibly loose his job as a tutor. Doc. 37-6, PageID 1988.] Duty conceded that he had not
investigated the subject matter of Steinhoff's April 3 incident report. (*Id.*, p. 65, PageID
2051.) Snyder testified during his deposition in this case that he went to talk with
Meekison and Strohm on April 3 because he knew they were moving. Meekison told
him she didn't have any information about the move. (July 9, 2010 Deposition of Todd
Snyder, pp. 69 and 136, Doc. 34, Page-ID 1702 and 1768.)

## B. Failure to Accommodate in Violation of the ADA

Defendants further argue that plaintiff cannot establish a *prima facie* case of discrimination under Title I of the ADA on the basis that she was denied a reasonable accommodation. Under the ADA, an employer must make "reasonable accommodations" to a disabled employee's limitations, unless the employer can demonstrate that to do so would impose an "undue hardship." 42 U.S.C. § 12112(b)(5)(A). The Warden does not argue that accommodating plaintiff's disability would have imposed an undue hardship. Rather, Brunsman argues that plaintiff was granted accommodations she sought. To prevail on a claim for failure to accommodate under the ADA, Meekison "must prove that (1) she has a disability; (2) she was qualified for the job; and (3) she was denied a reasonable accommodation for her disability . . . . " *Roush v. Weastec, Inc.*, 96 F.3d 840, 843 (6th Cir. 1996).

Plaintiff bears the initial burden of proposing an accommodation and demonstrating that the accommodation is objectively reasonable. *Hendricl v. W. Reserve Care SYSTEM.*, 355 F.3d 444, 457 (6th Cir. 2004). Defendants maintain that Brunsman first learned of Meekison's request for an accommodation in February 2007, and he told her to see CCI's ADA coordinator. Steinhoff Dep., 66:1-20, Doc. 30-2, PageID 1021. The ADA coordinator concluded that plaintiff had attended various classes and conferences concerning sex offenders, in addition to receiving training on DOTS and observing

38

other sex offender education classes. On April 27, 2007, the ODRC ADA Committee approved the request to move plaintiff's office to a quieter space.[8] Defendants maintain that because plaintiff received all the accommodations she requested, her failure to accommodate claim must fail.

Plaintiff, on the other hand, contends that she discussed her dyslexia with the Warden, Steinhoff, and other members of the Mental Health staff shortly after she was reinstated and asked for a quiet place to work. Meekison Decl., ¶6, Doc. 74-1, PageID 2611; Meekison Decl. II, ¶ 16, Doc. 74-1, PageID 2647. When asked whether shortly after she arrived at CCI Meekison requested an accommodation because she suffered from dyslexia, Warden Brunsman testified that he didn't know when she made the request but agreed that she had made such a request. Brunsman Dep., 66:16-24, Doc. 38-2, PageID 2099. Brunsman further testified that if Meekison had asked for an accommodation in 2006, he would probably have referred her to an ADA coordinator.

_____

[8]Plaintiff's brief also raised related ADA complaints. On July 26, 2006, just after Steinhoff came to CCI and became her supervisor, Meekison emailed him discussing various issues and including the statement that she was working on translating course materials into Spanish at home. She also wrote that she needed "to get caught up on my Task Reports to Central office. Sometimes I send this work from my home computer. . . ." Steinhoff Dep. 69:8-71: 14 and Ex. 3, Doc. 30-2 and 30-9, PageID 1024-26 and 1095. Steinhoff initially did not talk with Meekison about the matter, but when it came up again later he talked with his administrative supervisor, CCI Mental Health Administrator, Judy Immell. She told him it was ODRC policy that employees could not take work home, and Steinhoff directed Meekison not to take work home. *Id.*

At some point, Meekison also told Steinhoff that she had not had training opportunities in sex offender programming, and he scheduled her for some. She attended a 2-3 day program in Dayton. *Id.* 85:16-87:23, PageID 1040-42.

*Id.*, 68:12-69:22, PageID 2102-03. Plaintiff maintains that her working environment was very noisy. When Steinhoff criticized her productivity, Meekison said that she needed additional time, a quiet space, and training because of her dyslexia. According to plaintiff, she did not receive an accommodation until over a year after she made her initial request for a quiet place to work. Meekison maintains that CCI knew of her request for an accommodation in January 2006. In her December 28, 2012 declaration, plaintiff stated that when she first alerted CCI administration of the need for an accommodation she was not told to submit a formal requesting using the ODRC form. Doc. 74-1 at PageID 2647 at ¶24.

In his deposition, Steinhoff testified that he referred plaintiff to the ADA coordinator in response to her complaints about noise on the unit. Doc. 31-5 at PageID 1247; Steinhoff Dep. 280:11-23. In a December 27, 2006 email to Steinhoff, Meekison indicated that she has been attempting to cope with the noise and her dyslexia by working at home. She stated she required a quiet environment in order to concentrate. She asked whether she could access DOTS from her home to accommodate her dyslexia. Doc. 31-20 at PageID 1339. In a December 29, 2006 email sent to Steinhoff, Bobbitt, Immell and Berenson, Meekison reiterated that she was slower at reading and sequencing than the average person. Doc. 31-23 at PageID 1346.

Under the ADA, the employer and employee are required to engage in an interactive process to determine the extent of the disability and what accommodations

are appropriate and available. The employee has the initial duty to inform the employer of a disability by indicating to the employer that she has a disability and desires an accommodation. If the employee's disability or desired accommodation is ambiguous, the employer should seek clarification from the employee. An employer cannot shield itself from liability by choosing not to follow up on an employee's requests for assistance, or by intentionally remaining in the dark. Furthermore, the employer is required to provide an accommodation that effectively accommodates the disabled employee's limitations. *See U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 400 (2002) ("An *ineffective* 'modification' or 'adjustment' will not *accommodate* a disabled individual's limitations.") (emphasis in original); *Vande Zande v. State of Wisc. Dep't of Admin.*, 44 F.3d 538, 546 (7th Cir.1995) ("The duty of reasonable accommodation is satisfied when the employer does what is necessary to enable the disabled worker to work in reasonable comfort.").

Viewing the evidence in the light most favorable to Meekison, a reasonable jury could conclude that the Warden was sufficiently aware of plaintiff's disability in order to trigger the interactive process. Although defendant maintains that plaintiff received the training necessary for her position and was provided the opportunity to obtain additional training, plaintiff provided evidence supporting her assertion that she repeatedly sought training and that the training she had received was not sufficient. On several occasions, plaintiff informed her supervisors that additional training was necessary due to her disability because she had difficulty reading and sequencing.

41

Plaintiff testified in her deposition that although Steinhoff provided her with individual

assistance on a few occasions, his training did not meet her needs. Further, she offered

evidence that her request for a quieter workspace was not acted on for over a year.

### C.    Retaliation in Violation of the First Amendment

Plaintiff alleges that defendants violated her rights under the First and

Fourteenth Amendments.[9] The First Amendment protects "the right of the people . . . to

petition the Government for a redress of grievances." U.S. Constitution., Amdt. 1.

Plaintiff appears to be alleging that defendants retaliated against her in violation of the

First Amendment for filing her original disability discrimination lawsuit.

In *Connick v. Meyers*, the Supreme Court stated:

> [W]hen a public employee speaks not as a citizen upon matters of public
> concern, but instead as an employee upon matters only of personal
> interest, absent the most unusual circumstances, a federal court is not the
> appropriate forum in which to review the wisdom of a personnel decision
> taken by a public agency allegedly in reaction to the employee's behavior.

461 U.S. 138, 147 (1983). To determine whether an employee's speech addresses a

matter of public concern is determined by the content, form, and context of the

---

[9]The First Amendment did not apply to the States until the ratification of the
Fourteenth Amendment. *Morse v. Frederick*, 551 U.S. 393, 411 at n. 1(2007). Defendants
speculated that plaintiff was asserting a violation of her rights afforded by the Equal
Protection Clause of the Fourteenth Amendment. Plaintiff did not address this
argument. The Court assumes that the reference to the Fourteenth Amendment refers to
the incorporation of the First Amendment to the States by operation of the Fourteenth
Amendment.

statement. In *Borough of Duryea, Pa. v. Guarnieri,* 131 S. Court. 2488 (2011), the Supreme

Court held that the public concern tests also limited the Petition Clause claims of public

employees. The Supreme Court stated:

> If the Petition Clause were to apply even where matters of public concern
> are not involved, that would be unnecessary, or even disruptive, when
> there is already protection for the rights of public employees to file
> grievances and to litigate. The government can and often does adopt
> statutory and regulatory mechanisms to protect the rights of employees
> against improper retaliation or discipline, while preserving important
> government interests. *Cf. Garcetti* [*v. Ceballos*, 547 U.S. 410,] 425, 126 S.Ct.
> 1951 (noting a "powerful network of legislative enactments"). Employees
> who sue under federal and state employment laws often benefit from
> generous and quite detailed antiretaliation provisions. *See, e.g.*, Pa. Stat.
> Ann., Tit. 43, § 1101.1201(a)(4) (Purdon 2009); § 1101.1302. These statutory
> protections are subject to legislative revision and can be designed for the
> unique needs of State, local, or Federal Governments, as well as the special
> circumstances of particular governmental offices and agencies. The
> Petition Clause is not an instrument for public employees to circumvent
> these legislative enactments when pursuing claims based on ordinary
> workplace grievances.

*Borough of Duryea, Pa. v. Guarnieri*,  131 S.Ct. 2488, 2497 (2011).

Here, the basis of plaintiff's lawsuit did not address a public concern. The

allegations in the lawsuit only concerned her relationship with her employer and the

basis for her termination.  None of the cases cited by plaintiff in her brief[10] support a

contrary conclusion. In *Mt. Healthy City School District Bd. of Education. v. Doyle*, 429 U.S.

274, 282-86 (1977), the Supreme Court accepted the lower court's finding that providing

---

[10]December 28, 2012 Plaintiff's Brief Opposing Summary Judgment, pp. 31-32,
Doc. 73, PageID 2568-69.

a memorandum about a teacher dress code to a member of the media was speech on a matter of public concern. The issue before the Supreme Court was not whether that conduct was protected by the first amendment but whether the school board had an independent ground supporting its decision to terminate the teacher's employment. The remaining cases cited by plaintiff involved first amendment claims asserted by private individuals, not public employees.[11] Because plaintiff's dispute did not relate to a matter of public concern, Meekison's First Amendment rights were not implicated, and defendants' motion for summary judgment on plaintiff's claim for violation of her First Amendment rights is GRANTED.

## V.    Conclusion

Defendants Reginald Wilkinson, Terry Collins, and Timothy Brunsman's November 15, 2012 motion for summary judgment (doc. 70) is GRANTED in part and DENIED in part. Defendants' motion is GRANTED with respect to plaintiff's claims against Wilkinson and Collins and with respect to plaintiff's First Amendment claim against defendant Brunsman. This action continues with respect to plaintiff's claims for

---

[11]*Thaddeus-X v. Bladder,* 175 F.3d 378, 386-97 (6th Cir. 1999)(en banc)(Inmate's suit against prison officials for first amendment retaliation); *McCurdy v. Montgomery County, Ohio,* 240 F.3d 512 (6th Cir. 2010)(private citizen's claim that police officer arrested him in retaliation for exercising his first amendment rights); *Block v. Ribar,* 156 F.3d 673 (6th Cir. 1998)(private citizen who alleged sheriff retaliated for his exercise of the right to criticize public officials).

retaliation and failure to accommodate against defendant Brunsman in his official capacity.

s/Mark R. Abel
United States Magistrate Judge